## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MELISSA JACKSON,

     *Plaintiff*,

  v.

NEW ENGLAND BIOLABS, INC.,
PERSONAL REPRESENTATIVE OF
DONALD COMB, JAMES V. ELLARD,
RICHARD IRELAND, COMMITTEE OF
NEW ENGLAND BIOLABS, INC.
EMPLOYEES' STOCK OWNERSHIP PLAN,

     *Defendants*,

*and*

NEW ENGLAND BIOLABS, INC. NON-
VOTING STOCK OWNERSHIP PLAN,

     *Nominal Defendant*

Civil Action No. 23-_____

**CLASS ACTION COMPLAINT**

### INTRODUCTION

1.     Plaintiff brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., on behalf of a Class and Subclass of certain former employee participants (and their beneficiaries) in the New England Biolabs, Inc. Employees' Stock Ownership Plan & Trust, which in 2021 was renamed the New England Biolabs, Inc. Non-Voting Stock Ownership Plan (the "Plan"). This case arises out of (1) the adoption and implementation of a 2019 Amendment to the Plan that eliminated the right of participants who are former employees to hold New England Biolabs, Inc. ("NEB") stock in the

Plan, and (2) the liquidation of NEB stock in the Plan at share prices that were less than fair market value.

2.      While the Plan was denominated an "employee stock ownership plan" (or "ESOP") until 2021, it ceased to be an ESOP in 2013 and converted to a profit sharing plan. Both before and after 2013, the primary asset of the Plan has been its equity holdings in NEB. The Plan allocates shares of NEB stock to the individual accounts of Plan participants and that stock has been central to the compensation for NEB employees. Plaintiff and other members of the Subclass contributed to NEB's success and were able to share in that success as the value of the NEB stock holdings in their individual Plan accounts grew over time.

3.      The fiduciaries of the Plan had a duty to assure that participants received fair market value for their NEB stock when their shares were liquidated.  But, in practice, the fiduciaries of the Plan did little to nothing to ensure that participants received fair market value. Because of this lack of oversight, the valuation that served as the basis for establishing the price at which NEB shares were liquidated (and purchased by NEB) contained many errors that resulted in participants receiving less than fair market value for their shares. While paying less than fair market value for shares purchased from the former employee participants benefited NEB (and also the individual fiduciaries), it was not in the best interest of these former employees.  As a result of Defendants' breaches and violations, Plaintiffs and the Class received less than the fair market value of the NEB stock in their Plan accounts.

4.      Additionally, until the 2019 Amendment to the Plan, the written instrument of the Plan provided all former employees had the right to remain as participants in the ESOP and continue to hold NEB stock in their Plan accounts after they terminated or retired, at least until age 65.  As a result, Plaintiff and the Subclass were divested of the right to continue to hold NEB

stock in their Plan accounts.  As a result of Defendants' breaches and violations of ERISA, Plaintiff and the Subclass have also missed the continued appreciation in value of NEB stock.

5.      As a remedy, Plaintiff, on behalf of the Class and Subclass, seek to require Defendants to make good to the Plan any losses resulting from fiduciary violations, to restore to the Plan any profits made by the breaching fiduciaries through Plan assets, and to obtain other appropriate equitable relief to redress violations and enforce the provisions of Title I of ERISA and the Plan.

**PARTIES**

**Plaintiff**

6.      Plaintiff Melissa Jackson is a former employee of New England Biolabs, Inc. ("NEB"). Ms. Jackson was employed by New England Biolabs, Inc. from April 15, 1994, until September 27, 2019. When she left employment, she was not yet 65 years old. At the end of her employment, she was employed as a legal administrator for NEB. By no later than April 2019, Ms. Jackson had informed NEB (specifically Joe Secondine, General Counsel of NEB) that she would be retiring later in 2019 in order to provide NEB with several months advance notice. At least by April 14, 1996, she participated in the New England Biolabs, Inc. Employees' Stock Ownership Plan & Trust, which in 2021 was renamed the New England Biolabs, Inc. Non-Voting Stock Ownership Plan (the "Plan" or "ESOP"). She is a participant of the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), including because she has a colorable claim for additional benefits because of the fiduciary breaches and violations that improperly valued her NEB shares and liquidated her NEB shares before distribution. Had her NEB stock in the Plan been properly valued when those shares were liquidated, Ms. Jackson would have received more money when the value of her Plan account was distributed to her. Ms. Jackson resides in Sarasota, Florida.

2

**Defendants**

7.    Defendant NEB is a corporation organized under the laws of the Commonwealth of Massachusetts. NEB's principal place of business is in Ipswich, Essex County, Massachusetts. NEB is and has been since the inception of the Plan, the Sponsor of the Plan under ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), the designated Plan Administrator of the Plan under ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the Plan under ERISA § 402, 29 U.S.C. § 1102. According to the Plan Document, NEB established the Plan in 1985. Under the Plan, NEB was responsible for appointing, removing, and monitoring the Trustee and Committee and had the authority to remove its members and appoint a new Trustee and Committee. With these powers, Defendant NEB had the fiduciary responsibility to monitor the Trustee and Committee and remedy any fiduciary violations committed by the Trustee or Plan Committee. As a result, NEB was a fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Plan, or had discretionary authority or discretionary responsibility in the administration of the Plan, or any combination of the foregoing.

8.    Defendant Committee of the New England Bio Labs, Inc. Employees' Stock Ownership Plan ("Committee") was identified in Sections 2.3, 11.2 and Article 12 of the written instrument of the Plan dated October 1, 2013 ("2013 Plan Document") as one of the named fiduciaries of the Plan under ERISA § 402, 29 U.S.C. § 1102. Under Section 12.3 of the 2013 Plan Document, the Committee had all powers and authority necessary or appropriate to carry out its responsibilities for operating the Plan. The Committee meets the definition of a person under ERISA § 3(9), 29 U.S.C. § 1002(9), because ERISA defines the term person broadly and because a committee meets the definition of an association or an unincorporated organization.

The Committee and its members were fiduciaries of the Plan under ERISA § 3(21), 29 U.S.C. § 1002(21), because the Committee and its members had discretionary authority or discretionary responsibility for the administration of the Plan. Based on the 2003 SPD and the 2019 SPD, the members of the Committee at all times from at least 2003 to at least 2021 consisted of Donald Comb (until his death in 2020), Richard Ireland and James V. Ellard. The Committee and its members are referred to as the "Committee Defendants."

9.      Defendant the Personal Representative of Donald Comb ("Comb") is the representative for the former founder of NEB and CEO. Mr. Comb died in 2020. Comb was the Chairman of the Board of Directors from NEB's founding in 1974 until his death. As a member of the Committee and one of the Trustees of the Plan, Comb was fiduciary of the Plan under ERISA § 3(21), 29 U.S.C. § 1002(21), from at least 2003 until his death in 2020.

10.     Defendant James V. Ellard ("Ellard") was the Chief Executive Officer of NEB from at least 2005 until August 15, 2022.  Since 2022, Ellard has been the Chairman of the Board of NEB. Ellard has been a member of the Committee since at least 2003. Ellard was a Trustee of the Plan from at least 2003 through 2021.  As a member of the Committee and one of the Trustees of the Plan, Ellard was a fiduciary of the Plan under ERISA § 3(21), 29 U.S.C. § 1002(21) from at least 2003 through at least 2021. Ellard has a business address at Ipswich, Essex County, Massachusetts.

11.     Defendant Richard "Rick" Ireland ("Ireland") is the Chief Financial Officer of NEB.  Ireland has been a member of the Committee since at least 2003. Ireland was a Trustee of the Plan from at least 2003 until at least 2021.  As a member of the Committee and one of the Trustees of the Plan, Ireland was a fiduciary of the Plan under ERISA § 3(21), 29 U.S.C. §

1002(21) from at least 2003 through 2021. Ireland has a business address at Ipswich, Essex County, Massachusetts.

12.     Defendants Comb, Ellard, and Ireland are referred to collectively here as the "Trustees" or "Trustee Defendants." The Trustees are identified in Sections 2.14 and 11.3 as well as Article 13 of the written instrument of the Plan as one of the named fiduciaries of the Plan under ERISA § 402, 29 U.S.C. § 1102. As a result, the Trustees are and were fiduciaries of the Plan under ERISA § 3(21), 29 U.S.C. § 1002(21), because the Trustees have discretionary authority or discretionary responsibility for the administration of the Plan as stated in Article 13. Based on the 2003 SPD, the 2019 SPD, and the Form 5500 for the Plan year ended September 30, 2021, effective June 28, 2021, the Trustees consisted of Donald Comb ("Comb"), Ellard, and Ireland at all times from at least 2003 until 2020, when Comb died. Ellard and Ireland remained Trustees until 2021 (when NEB appointed TI-Trust, Inc. as the independent trustee of the Plan).

**Nominal Defendant**

13.     Nominal Defendant New England Biolabs, Inc. Non-Voting Stock Ownership Plan ("the Plan"), is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). According to the Form 5500 for the Plan year ended September 30, 2021, effective June 28, 2021, the Plan restated its plan document to incorporate all amendments since the plan document dated October 1, 2013, and changed the plan name from the New England Biolabs, Inc. Employees' Stock Ownership Plan to the New England Biolabs, Inc. Non-Voting Stock Ownership Plan. The Plan purports to be a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Before 2013, the Plan was an employee stock ownership plan ("ESOP") under ERISA § 407(d)(6) that was intended to meet the requirements of Section 4975(e)(7) of the Internal Revenue Code ("Code") and IRS

Regulations § 54.4975-11. The written instrument, within the meaning of ERISA § 402, 29

U.S.C. § 1102, by which the Plan was maintained until June 28, 2021, was the New England

Biolabs, Inc. Employee Stock Ownership Plan & Trust, effective as of October 1, 2013, as

amended. According to Schedule A of the 2013 Plan Document, the Plan was amended effective

October 1, 2013, to become a profit-sharing plan. The Plan is named as a nominal defendant

under Rule 19 to ensure that complete relief can be granted as to claims brought on behalf of the

Plan. The Plan has a business address at Ipswich, Essex County, Massachusetts.

## JURISDICTION & VENUE

14.     This Court has subject matter jurisdiction over the claims in this Complaint

because the claims are all brought under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001 *et seq*. As a result, this Court has subject matter jurisdiction over

this action pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because this action arises

under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1).

15.     This Court has personal jurisdiction over the Defendants because ERISA provides

for nationwide service of process under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

16.     Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2),

because the breaches and violations giving rise to the claims occurred in this District, one or

more (in fact all) Defendants may be found in this District, and the Plan is administered in this

District.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings these claims as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of the following Class:

All participants in the New England BioLabs Employee Stock Ownership Plan and whose NEB stock in their Plan account (in whole or in part) was liquidated on or after September 29, 2017, and the beneficiaries of such participants.

18.     Plaintiff brings certain claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Subclass:

All members of the Class who were former employees of NEB as of September 30, 2019, and had their NEB stock in their New England BioLabs Employee Stock Ownership Plan accounts liquidated in 2019, and the beneficiaries of such participants.

19.     Excluded from the Class and the Subclass are (a) the Defendants, (b) officers and directors of NEB, (c) other persons who had decision-making or administrative authority relating to the administration, modification, funding or interpretation of the Plan, (d) the beneficiaries of such persons or the immediate family members of any of the foregoing excluded persons, (e) any participant who previously settled the claims asserted by this Complaint, and (f) the legal representatives, successors and assigns of any such excluded persons.

**Impracticability of Joinder**

20.     The members of each of the Class and the Subclass are so numerous that joinder of all members is impracticable. According to a statement by made to the United States Department of Labor ("DOL") by NEB's controller, Brian Tinger ("Tinger"), there were approximately 50 inactive (i.e. former employee) participants of the Plan at the time of the 2019 Amendment (defined below) and who would thus be members of the Subclass and the Class. Based on the Form 5500s, additional former employee participants had their accounts liquidated prior to 2019 and would thus, along with the members of the Subclass, be members of the Class. Most of the Plan participants likely had at least one beneficiary, because every married participant had at least one beneficiary (e.g., a spouse) and some participants likely designated

more than one beneficiary. As such, both the Class and the Subclass likely consist of at least one hundred persons.

**Commonality**

21.     The issues of liability are common to all members of each of the Class and the Subclass and are capable of common answers as those issues include: whether the Trustees and the Committee Defendants breached fiduciary duties to the Plan; whether the Trustees engaged in prohibited transactions; whether the Plan suffered losses because of the fiduciary breaches and violations of Defendants; and what is the appropriate relief for these ERISA violations.

**Typicality**

22.     Plaintiff's claims are typical of those of each of the Class and the Subclass because the claims arise from the same events, practices, or course of conduct. These claims challenge the Trustees' valuation of the assets in the Employer Stock Account and the assets in the Dollar Account in connection with the liquidation of those assets in the Plan using similar methodologies and pursuant to the same provisions of the 2019 Amendment.

23.     Plaintiff's claims are also typical of the claims of the other members of each of the Class and the Subclass, because the relief primarily sought consists of (a) a declaration that the Defendants breached their duties and/or violated ERISA, (b) requiring the fiduciaries make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan; and (c) payment for any such recovery from the Plan fiduciaries into the Plan. Any remedial or equitable relief will flow to all Class and Subclass Members through their Plan accounts.

**Adequacy**

24.     Plaintiff will fairly and adequately represent and protect the interests of the Class and the Subclass.

25.     Plaintiff does not have any interests antagonistic to or in conflict with those of the Class or the Subclass.

26.     Defendants have no unique defenses against Plaintiff that would interfere with her representation of the Class the Subclass.

27.     Plaintiff is represented by counsel with experience prosecuting class actions in general and ERISA class actions.

**Rule 23(b)(1)**

28.     The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and the participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the former employee-participants. As a result, prosecution of separate claims by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

29.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan, engaged in prohibited transactions with respect to the Plan, or knowingly participated in such breaches or violations as to Plaintiff's claims would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would

substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

**Rule 23(b)(2)**

30. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because the Defendants have acted or failed to act on grounds generally applicable to the Class and the Subclass, making declaratory and injunctive appropriate with respect to the Class and the Subclass as a whole. This action challenges whether the Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Class and the Subclass as a whole. The relief sought primarily consists of declarations that the Defendants breached their fiduciary duties or engaged in other violations of ERISA and injunctive relief. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

**Rule 23(b)(3)**

31. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties or violated ERISA as to the Plan. As the members of the Class and the Subclass were participants in that Plan (or beneficiaries of such participants), their accounts were affected by those breaches and violations. Common questions related to liability will predominate over any individual questions precisely because the Defendants' duties and obligations were uniform to all participants and therefore all members of the Class and the Subclass. As relief and any recovery will be on behalf of the Plan, common questions of remedies will likewise predominate over any individual issues.

32. A class action is a superior method to other available methods of the fair and efficient adjudication of this action. As the claims are brought on behalf of the Plan or involve

Plan-wide issues, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about the Defendants' duties to the Plan.

33.    The following factors set forth in Rule 23(b)(3) also support certification:

(a)    The members of the Class and the Subclass have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

(b)    No other litigation concerning this controversy has been filed by any other members of the Class.

(c)    This District is the most desirable location for concentrating this litigation because (i) the Defendants are located in this District, (ii) the Plan is administered in this District; (iii) the majority of the participant class members are likely located in this District; and (iv) a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.

## FACTUAL ALLEGATIONS

34.    NEB claims on its website to have been founded in the mid-1970s as a collective of scientists committed to developing innovative products for the life sciences industry. NEB also claims on its website to be a recognized world leader in the discovery and production of enzymes for molecular biology applications.

**Background Regarding the Plan**

35.    According to the 2013 Plan Document, NEB adopted the Plan effective as of October 1, 1985. According to the 2013 Plan Document, the Plan was converted from an ESOP to a profit sharing plan as of October 1, 2013.

36.    Under the terms of the 2013 Plan Document, the employee-participants did not have any decision-making authority or control over the investment of their accounts in the Plan. As described in various Sections of the 2013 Plan Document, including Sections 6.6, 11.3, 13.2(a), 13.3 and 13.5, the Trustees of the Plan made and controlled all investment decisions, including decisions regarding how the accounts of individual participants would be invested.

37.    According to an email on December 3, 2019, from Tinger in response to a request for documents under ERISA § 104(b), at that time there had only been two Summary Plan Descriptions (SPDs) issued to participants: one dated December 22, 2003, and one dated August 2019.

38.    According to the 2003 SPD and the 2019 SPD, "[u]nder the Plan, Plan participants become stockholders – part owners – of Biolabs. As a stockholder, [employees] have a direct stake in Biolabs' future success because [employees] will benefit from any increase in the value of the Biolabs stock in [the employee's] Plan account."

39.    Based on the Form 5500s filed by NEB with the United States Department of Labor, the Plan has held the following types of investments: (1) mutual funds that registered with the SEC and which are valued at the daily closing price; (2) pooled separate accounts which are valued at the net asset value as provided by the contract issuer; (3) NEB stock (i.e. Employer or Company Stock), which is not publicly traded and the price of which is determined, according to the Form 5500s, based on the appraisal of an outside valuation firm; and (4) the stock of Cell

Signaling Technology ("CST") which is not publicly traded and the price of which is determined, according to the Form 5500s, based on the appraisal of an outside valuation firm.

**Relevant Provisions of the 2013 Plan Document**

40.    According to Section 6.1 of the 2013 Plan Document, the Committee was required to establish two separate accounts for each Plan Participant as follows: a Dollar Account and an Employer Stock Account. The Employer Stock Account held Employer Stock and the Dollar Account held other investments.

41.    Section 6.4 of the 2013 Plan Document provided that the fair market value of Employer Stock and other assets in the Plan will be determined by the Trustees at the applicable Valuation Date "and at any other time that the Committee may direct."

42.    Section 2.15 of the 2013 Plan Document provided that the Valuation Date for purpose of valuing Employer Stock is defined as "the last day of the entity's fiscal year applicable to such stock."  Pursuant to this provision, the Valuation Date for NEB stock depended on the fiscal year for NEB, not the Plan. While the 2013 Plan Document identified the Plan Year, it did not disclose the last day of the fiscal year for NEB.

43.    Section 2.15 of the 2013 Plan Document (after the First Amendment effective as of October 1, 2015) provided the Valuation Date for the Dollar Account "means the last business day of the Plan Year." Section 2.10 of the 2013 Plan Document defined the Plan Year so that the last business day was the last business day before October 1.

44.    The 2019 SPD claimed that the usual Valuation Date for NEB stock was September 30. Both SPDs also represented that "[t]he Committee may also request a valuation at any other time."

45.     Section 6.6 of the 2013 Plan Document mandated that the value of mutual funds, which are held in the Dollar Account, be determined based on the price at the end of each business day.

46.     Section 6.4 of the 2013 Plan Document allowed the Trustees to use the services of an outside appraisal firm engaged by the Employer or the Trustees to assess the fair market value of the Employer Stock; however, the ultimate determination of the fair market value of the NEB and CST stock and assets other than mutual funds was made by the Trustees.

47.     Both the 2013 SPD and the 2019 SPD represented that "the valuation of the Company stock *will be* performed by an outside firm of valuation specialists" and "that valuation report *will be* used to determine the fair market value of [NEB and CST] stock in [a participant's] account."

48.     Section 6.4 of the 2013 Plan Document required the Trustees to notify NEB of the Trustees' valuation determinations.

49.     Section 7.1 of the 2013 Plan Document provided that "[a] Participant who retires or terminates employment with the Employer or Related Employer for any reason (other than death) will receive the amount in his accounts" and such amounts would be payable in accordance with Article 8. Section 7.1 of the 2013 Plan Document also provided that "[n]o distributions will be made to any Participant while he is still an Employee of the Employer."

50.     Section 8.1(a)-(c) of the 2013 Plan Document provided that distributions from a Participant's Dollar Account would be in cash and distributions from a Participant's Employer Stock Account would be in cash unless the Participant elected to receive shares in stock.

51.     Section 8.1(d) of the 2013 Plan Document provided that if the distribution of a Participant's Employer Stock Account would be in cash, then "the Trustees will convert the shares and fractional shares of Employer Stock."

52.     Section 8.3(b)(1) of the 2013 Plan Document provided that "a Participant may defer distribution of his accounts until his 65th birthday."

**NEB Amends the Plan as of August 1, 2019 & Liquates the Accounts of Former Employees**

53.     Effective August 1, 2019, NEB adopted the Third Amendment to the Plan, which changed the Plan for former employees who remained as participants in the Plan (the "2019 Amendment"). The 2019 Amendment added a new Section 6.9 and amended Sections 8.1, 8.2, 8.3, 8.4, 9.1 and 13.4 of the 2013 Plan Document.

54.     According to notes made by the DOL of a conversation with Tinger on August 30, 2019, the purpose of the 2019 Amendment was to allow NEB to divest the former employees of their shares so NEB could "recirculate" those shares and "make [those] shares are available to new employees."

55.     Based on notes made by the DOL of a conversation with Tinger on August 30, 2019, the 2019 Amendment was specifically adopted before the end of the Plan Year.

56.     The effect of the 2019 Amendment was to eliminate the ability of former employees to remain invested in Employer Stock through the Plan.

57.     Before August 2019, former employees could request to liquidate their accounts including their shares in NEB and CST stock; however, based on information from the Form 5500s, most former employees did not request to liquidate their accounts until they were required to do so.

58.    According to Note E, entitled "PARTY-IN-INTEREST TRANSACTIONS" to the Financial Statements of the 2018 Form 5500 filed with the DOL, the following amounts of shares were "repurchased" from participants in 2019:

     a.   26,747 of NEB voting stock;

     b.   61,936 shares of NEB non-voting stock; and

     c.   96,913 shares of "affiliated company preferred stock" which is believed to be CST stock.

59.     According to Note C of the Financial Statements of the 2018 Form 5500 filed with the DOL, the shares of stock distributed in 2019 at a value of $43,321,280, of which $38,783,330 was paid for NEB shares and $4,537,950 was paid for CST shares. Upon information and belief, most of these amounts were paid to former employees who shares were liquidated because of the 2019 Amendment.

60.    Ms. Jackson's NEB shares in the Plan were liquidated on September 29, 2019. Upon information and belief, shortly after her NEB shares in the Plan were liquidated (i.e. converted to cash), they were then distributed to her.

**Investments and Assets of the Plan**

61.    As of September 30, 2018, and September 30, 2019, the Plan reported the following investments and values on the Form 5500s:

| Investments | 2018 | 2019 |
|---|---|---|
| Mutual Funds | $14,084,232 | $5,295,437 |
| NEB stock | $252,943,856 | $293,748,583 |
| CST stock | $18,193,499 | $16,281,616 |
| Pooled separate accounts | $5,932,628 | $1,728,155 |

62.     Based on the amount in liquid and semi-liquid investments and the amount of contributions from NEB during 2019, the Plan lacked sufficient cash or liquid investments from which to purchase more than $43 million of Employer Stock (i.e., NEB and CST stock).

63.     As of September 30, 2019, the Plan held about $293 million in voting and non-voting stock of NEB, about $16 million in CST (a privately held entity) preferred stock, about $1.7 million in pooled separate accounts and about $5.2 million in mutual funds.

**Value of Plaintiff's Accounts in the Plan**

64.     By letter dated August 6, 2019, Tinger wrote to former employees of the Plan who still had account balances:

> As an inactive participant in the New England Biolabs, Inc. Employee Stock Ownership ("ESOP"), I would like to notify you of some upcoming changes.
>
> This September, you will once again be allowed to elect a distribution from the ESOP. However, **if you do not elect** [emphasis in original] a distribution in 2019, the ESOP will automatically convert the value of your NEB and CST stock into cash. This cash will then be deposited into your side fund account within the ESOP. We are making this change so that more stock will be available for new and active employees.
>
> By electing a distribution, especially in the form of a tax-free rollover to a qualified retirement account (such as a 401 (k) or an IRA), you will have control over how your money is invested.
>
> Enclosed with this letter is your most recent ESOP account statement as of September 30, 2018. Within the next few days, you will receive a notice from Principal with instructions on how to elect your distribution and perform a tax free rollover.
>
> If you have any questions, please feel free to reach out to me directly.
> Sincerely,
> /s/ Brian T. Tinger

65.     On August 6, 2019, Tinger emailed current employees of NEB, including Plaintiff, notifying them of the 2019 Amendment:

I would like to notify all full time employees of some changes to the Employee Stock Ownership Plan ("ESOP").

The primary reason for these changes is to ensure that NEB stock will be available for new and active employees. We decided to put these measures in place to restrict non-employees from retaining ownership of NEB stock, thereby promoting the recycling of shares to existing employees.

Effective August 1, 2019, when an individual leaves NEB they will have the option to take a distribution and "cash out" of the ESOP plan. If they defer their distribution election and decide to keep their money in the ESOP, the plan will automatically convert the value of their NEB & CST stock into cash. This cash will then be deposited into the individual's side fund account within the ESOP and their money will increase/decrease each year based on the performance of the side fund.

Participants will still be able to pursue NUA (Net Unrealized Appreciation) and elect a distribution in the form of shares, but NEB will only be obligated to repurchase the shares at 2 points in time:
1)     the fiscal year in which the person separates from service
2)     the fiscal year after the person separates from service.
NEB will no longer be obligated to repurchase the shares at age 60 or age 65.

Please let me know if you have any questions about these changes as I'd be happy to speak with you.

Brian T. Tinger


66.     Plaintiff was not notified of the 2019 Amendment until after it was adopted and

made effective.

67.     On August 8, 2019, Tinger sent an email to employees of NEB which stated:

I'd like to convey answers to some common questions that I've been receiving about this announcement:

Q: What happens to individuals who left NEB and still have their money in the ESOP? Does this new policy apply to them as well?
A: Yes, this new policy applies to them as well. Former employees were sent a letter on Tuesday informing them of these changes. As such, they will be allowed to take a distribution in Sept 2019. If they defer their distribution election in Sept 2019 and decide to keep their money in the ESOP, the plan will automatically convert the value of their NEV & CST stock into cash. This cash will then be deposited into the individual's side fund account within the ESOP.

Q: Does this mean that more stock will be available to employees?
A: Yes, I expect that this change will result in more stock being available to employees this year. As for future years, I expect this change will promote the recycling of shares, thereby ensuring that stock will continue to be available to employees.

Brian T. Tinger

68.     In the Annual Statements issued to Plaintiff, NEB as the Plan Administrator represented to her that the Plan held the following for her benefit as of September 29, 2018:

| Investment | 2018 Value |
|------------|------------|
| Side Fund  | $137,196.63 |
| NEB Stock  | $1,157,137.81 |
| CST Stock  | $72,996.88 |
| Totals     | $1,367,331.32 |

69.     Plaintiff terminated her employment with NEB on September 27, 2019.  But Plaintiff had informed NEB (specifically NEB General Counsel Joe Secondine) of her intent to retire in 2019 by as early sometime in late 2018 and by no later than April 2019.  She provided substantial advance notice of her intended retirement because Mr. Secondine had previously told her given her longevity at the company, her accumulated knowledge, and her position that he would want more than two-week notice.

70.     Because of the 2019 Amendment, the NEB stock in Plaintiff's Plan account was involuntarily liquidated on or after September 29, 2019.  The liquidation of Plaintiff's NEB stock and upon information and belief, the stock of other members of the Class, was not liquidated at its value in September 2019, but at a valuation as of September 30, 2018.

71.     According to the 2018 Form 5500 filed with the DOL on September 15, 2020 (the most recent Form 5500), the NEB stock held in the Plan appreciated by $70,705,057 (or 27%)

between September 30, 2018, and September 30, 2019. The Form 5500 does not provide further detail about any difference between the voting share and non-voting shares of NEB stock.

72.     Had the NEB shares in Ms. Jackson's account been valued at the September 30, 2019, price when the fiduciaries of the Plan liquidated her shares on September 29, 2019, Jackson would have received at least $312,427.21 more.

**The Valuation of NEB Stock Held by the Plan**

73.     The Trustees needed to undertake an appropriate and independent investigation of the fair market value of the assets of the Plan to fulfill their fiduciary duties in connection with the liquidation of Plaintiff and Class members NEB stock. Among other things, the Trustees needed to conduct an independent review of each appraisal, to make certain that reliance on any valuation expert's advice was reasonably justified under the circumstances of the purchase, to make an honest, objective effort to read and understand the valuation reports and opinions, and to question the methods and assumptions that did not make sense. The Trustees did none of these tasks which were fundamental fiduciary duties in connection with the Plan.

74.     Based on non-confidential deposition testimony in October 2021 by Tinger in *New England Biolabs, Inc. v. Miller* (the "*Miller* Litigation"), Berkeley Research Group ("BRG") provided annual valuations for NEB stock between at least 2016 and 2019.

75.     Based on non-confidential portions of the October 2021 deposition testimony by Jeffrey Dunn in the *Miller* Litigation, Dunn was the individual at BRG responsible for the annual valuation of NEB stock. Tinger was the primary point of contact between BRG and NEB.

76.     Based on Dunn and Tinger's testimony, BRG never made any presentation of its findings of any kind to the ESOP's Trustees – over the phone, virtually, in-person, or otherwise – regarding the valuation reports it prepared or the methodology of the valuation.

77. Dunn testified in October 2021 that he did not even know the identities of the Trustees and also testified he did not know them when he prepared the 2016 valuation report.

78. Based on Dunn's testimony, no questions about the valuation reports were ever directed to BRG by the board of directors of NEB – i.e., Comb, Ireland, and Ireland, who were also the Trustees of the Plan.

79. Based on Tinger's testimony, Tinger shared "the contents of the valuation" of NEB stock prepared by BRG with Ireland and Ellard, but he did not share their contents with one of the Trustees, Comb, every year.

80. Tinger testified that he could not recall ever having a substantive discussion with Ellard, Ireland, or Comb about the conclusions, methodology, or assumptions of the BRG valuations of NEB stock from 2016 through 2019.

81. At least one of the Trustees misunderstood his responsibilities with respect to the Plan and specifically to determining the value of NEB stock. Section 6.14 of the 2013 Plan Document stated explicitly that "the Trustees will determine the fair market value of a share of Employer Stock." Defendant Ellard testified at his October 2021 deposition in the *Miller* litigation that he believed that determining the valuation of NEB shares was not one of his duties in 2016, 2017, 2018, or 2019. This testimony demonstrated an ignorance of his fiduciary duties.

82. Ellard also testified at his October 2021 deposition that he had never known, at any time, what assets had been held by the Plan, and that he did not know the identity of the person or firm who had performed valuations of NEB stock at any time.

83. Ellard testified at his October 2021 deposition in the *Miller* litigation that he and the other Trustees never had any meetings about the Plan to discuss its business in 2016, 2017, 2018, or 2019.

84. Ellard testified at his October 2021 deposition in the *Miller* litigation that he could not recall ever seeing a valuation report for NEB stock.

85. Ellard testified at his October 2021 deposition in the *Miller* litigation that he did nothing to test the assumptions or conclusions of the valuation that was provided by the valuation company regarding NEB stock in 2016, 2017, 2018, or 2019. On information and belief, none of the other Trustees did so either.

86. The Trustees could not fulfill their fiduciary duties by blindly relying on either the price of the stock determined by an "expert" or simply reading a valuation report.

87. The BRG valuation reports providing an opinion of value for NEB stock did not reflect fair market value as of the Valuation Date because of multiple substantive errors. While the Trustees do not appear to have reviewed the BRG valuation reports themselves, the Trustees did rely on the conclusion of value to determine the price of NEB stock for the purpose of liquidating former employees' NEB stock in the Plan. Because of their reliance on that conclusion of value, the price at which former employees' NEB stock was liquidated did not reflect fair market value as of the Valuation Date because of multiple substantive errors.

88. The errors made by BRG in valuing NEB stock included failing to properly account for the effect of the provisions of the written instrument of the Plan on the value of NEB stock held by the Plan. Based on non-confidential portions of the October 2021 deposition testimony of Jeffrey Dunn, BRG was never provided with the written instrument of the Plan. In October 2021, Dunn testified that he had not ever seen the Plan's written instrument and could not recall whether BRG had ever even received a summary of its terms.

89. The provisions of the written instrument of the Plan would have impacted a key component of the valuation analysis for NEB stock: the discount for lack of marketability. The

marketability or liquidity of an asset refers to the degree to which it can be converted to cash quickly, without incurring large transaction costs or price concessions. The reason liquidity affects asset prices is that investors price securities according to their returns net of trading costs, such as transactions costs and expected price concessions, and thus require a higher return for these higher costs of achieving liquidity. Given two assets with the same cash flows but with different liquidity, investors will pay less (*i.e.*, demand a higher return) to hold the less liquid of these two assets. For this reason, financial economists expect that asset and security prices will differ systematically depending on the marketability characteristics of the securities, all else equal.

90.     An appraiser valuing a privately held business, such as NEB, should and, if properly conducting a valuation, will apply a discount for lack of marketability to reflect that an investor would demand a higher return to purchase an illiquid asset as compared to the shares of a publicly traded company for which there is a ready market.

91.     According to a leading business valuation treatise, studies of the discounts that are typically observed when unregistered shares are privately sold at prices less than a company's then prevailing publicly traded stock price "are widely recognized to provide evidence of the difference between the price of a publicly traded stock and the price of a stock that is otherwise the same or similar but not eligible for public trading as of the valuation date." Shannon Pratt, *Business Valuation: Discounts and Premiums* at 87 (2d Ed. 2009). These studies report average liquidity discounts for restricted stock of 13% to 42% based on hundreds of transactions over the last nearly 50 years. Many experts and courts use these studies as an empirical guide in selecting marketability discounts for valuations of closely held companies.

92.     But businesses owned by an employee benefit plan holding employer stock are a special case because the written instruments of such plans are required to have a put option on employer stock. A leading business valuation treatise explains the impact of a put option on valuation:

> The economic factor that generally distinguishes ESOP shares in closely held corporations is that a "put option" is required to be attached to the ESOP shares. Without this put option, employees could be forced to hold employer securities for extended periods of time. The put option requires the employer to provide the needed liquidity by repurchasing the distributed employer securities. This employer obligation to purchase shares is referred to generally as the repurchase obligation . . . . Most ESOP valuation practitioners interpret the ESOP put right as ***substantially mitigating, if not eliminating, any marketability discount that would otherwise apply***.

Shannon Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* at 818-19 (2008 5th Ed.) (internal quotation marks removed) (emphasis added).

93.     The 2013 Plan Document included a put option, providing as follows:

> Participant's Option to Require Purchase by Employer…. A Participant (or Beneficiary) to whom shares of Employer Stock were distributed… may require the Employer to purchase any or all of such shares by filing with the Employer a written notice stating the number of shares of Employer Stock he intends to sell. In the case of shares represented by a physical stock certificate, such notice must be accompanied by the certificate representing such shares endorsed in blank or with a duly executed stock power.

2013 Plan Document at § 9.1(a).

94.     The put option in the Plan should have reduced, if not eliminated, any marketability discount that would otherwise apply to NEB stock held by the Plan.

95.     Because BRG was never provided with the written instrument of the Plan or a summary of its terms, BRG was unaware of the existence of this put option.  As a result, BRG did not mitigate or eliminate the marketability discount applied to NEB stock held by the Plan taking into consideration the put option.

96.    Had the Trustees conducted a proper review of the BRG valuation reports and assured that BRG had a copy of the Plan and other material to conduct an appropriate valuation, the Trustees should have and would have discovered this error and realized that the BRG assessment of the price for NEB stock was not the stock's fair market value.

**The Valuation of NEB Stock Held by the Plan after September 2019**

97.    The Plan's Form 5500 for the Plan Year ending September 30, 2018, reported that the Plan held 275,230 shares of NEB Class A voting stock with a current value of $122,532,316, implying a per share value of approximately $445.20. It also reported that the Plan held 300,418 shares of NEB Class B non-voting stock with a current value of $130,411,540, implying a per share value of approximately $434.10.

98.    The Plan's Form 5500 for the Plan Year ending September 30, 2019, reported that the Plan held 263,483 shares of NEB Class A voting stock with a current value of $156,034,526, implying a per share value of approximately $592.20. The Form 5500  also reported that the Plan held 238,482 shares of NEB Class B non-voting stock with a current value of $137,714,057, implying a per share value of approximately $577.46.

99.    The Plan's Form 5500 for the Plan Year ending September 30, 2020, reported that the Plan held 263,483 shares of NEB Class A voting stock with a current value of $345,425,977, implying a per share value of approximately $1,311.00. The Form 5500 also reported that the Plan held 222,446 shares of NEB Class B non-voting stock with a current value of $284,286,244, implying a per share value of approximately $1,278.00.

100.    The Plan's Form 5500 for the Plan Year ending September 30, 2021, reported that the Plan held 219,210 shares of NEB Class B non-voting stock with a current value of $765,823,986, implying a per share value of approximately $3,493.56.[1]

101.    The reported value of NEB stock thus increased by more than 800% between September 30, 2018 (the date used to value the NEB stock of the Subclass) and September 30, 2021.

102.    The Plan's Form 5500 for the Plan Year ending September 30, 2021, reported that NEB declared and paid a dividend of $80 per share in October 2021 and a dividend of $28 per share, payable to all shareholders, dividends in the aggregate amount of $162 million.

103.    Plaintiff and members of the Subclass were deprived of the opportunity to share in this growth in the value of NEB stock and in these dividends because their NEB stock was involuntarily liquidated in 2019 by operation of the 2019 Amendment.

## COUNT I
### Engaging in Prohibited Transaction Forbidden by ERISA § 406(a),
### 29 U.S.C. §§ 1106(a), Against the Trustee Defendants and NEB on behalf of the Class

104.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

105.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

---

[1] Based on the Plan's Form 5500 for the Plan Year ending September 30, 2021, effective June 28, 2021, NEB created a new ESOP and transferred all shares of NEB Class A Voting Stock into the new plan, while the shares of NEB Class B Non-Voting Stock, shares of CST stock, and the existing dollar account remained within the existing Plan.

106.    ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include (A) any fiduciary of a plan and (C) an employer of whose employees are covered by such plan. NEB was a fiduciary of the Plan and was also an employer whose employees were covered by the Plan. Defendant NEB qualified as "party in interest" within the meaning of ERISA § 3(14).

107.    Pursuant to the 2013 Plan Document, the Trustee held legal title to the NEB stock allocated to the individual Plan accounts of the Class. The Trustees sold the NEB stock allocated to the individual Plan accounts of Plaintiff and the Class on or around September 29 of 2017, 2018, and 2019.

108.    According to Article 9 of the 2013 Plan Document, the NEB stock held in the individual Plan accounts could be purchased by either NEB or the Trustees. As explained in the Form 5500s, NEB is required to buy any shares in the participant's employer stock account for which there is no market. According to the 2018 Form 5500 (including a Section entitled "PARTY IN INTEREST TRANSACTIONS"), shares of NEB and CST stock were liquidated and distributed in 2019 for which $43,321,280 was paid for those shares. Based on the 2018 Form 5500, the Plan's combined liquid investments (mutual funds) and semi-liquid investments (pooled separate accounts) and employer contributions were far less than $43 million. Similarly, in 2017 the amount of benefits paid exceeded the amount of contributions and the amount of change in the liquid investments. As such, NEB would have been required to and, upon information and belief, did purchase the shares of NEB in 2019 and in other years.

109.    ERISA § 408(e), 29 U.S.C. § 1108(e) provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a plan if a sale is made for adequate consideration. The burden is on the fiduciary to prove that conditions for the exemption are met.

110.    ERISA § 3(18)(B) defines adequate consideration as "the fair market of the asset as determined in good faith by the trustee or named fiduciary." ERISA § 3(18)(B) requires that the price paid must reflect the fair market value of the asset, and the fiduciary must conduct a prudent investigation to determine the fair market value of the asset.

111.    For the reasons described above, no such prudent investigation was conducted, and the price paid for the Class's NEB stock did not reflect the fair market value of the asset.

112.    As a result, the Trustees caused the Plan to engage in a prohibited transaction in violation of ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D).

113.    NEB had knowledge of the facts and circumstances giving rise to this prohibited transaction, including because the Trustees who caused it were also directors of NEB and thus their knowledge is imputed to NEB as a matter of law. NEB knowingly participated in a prohibited transaction and is subject to appropriate equitable relief for these violations under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT II
### Engaging in Prohibited Transaction Forbidden by ERISA § 406(b), 29 U.S.C. §§ 1106(b), Against NEB on behalf of the Class

114.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

115.    ERISA § 406(b), 29 U.S.C. § 1106(b), mandates that a plan fiduciary shall not (1) "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or (2) "deal with the assets of the plan in his own interest or for his own account," or (3) "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

116.    NEB was identified as the Plan Administrator of the Plan by the 2013 Plan Document and has been a named fiduciary of the Plan at least since 2013.

117.    According to Article 9 of the 2013 Plan Document, the NEB stock held in the individual Plan accounts could be purchased by either NEB or the Trustees. As explained in the Form 5500s, NEB is required to buy any shares in the participant's employer stock account for which there is no market. According to the 2018 Form 5500 (including a Section entitled "PARTY IN INTEREST TRANSACTIONS"), shares of NEB and CST stock were liquidated and distributed in 2019 for which $43,321,280 was paid for those shares. Based on the 2018 Form 5500, the Plan's combined liquid investments (mutual funds) and semi-liquid investments (pooled separate accounts) and employer contributions were far less than $43 million. Similarly, in 2017 the amount of benefits paid exceeded the amount of contributions and the amount of change in the liquid investments. As such, NEB would have been required to and, upon information and belief, did purchase the shares of NEB in 2019 and in other years.

118.    By purchasing shares of NEB stock from the Plan to fund the liquidation of the NEB stock of Plaintiff and the Class, NEB acted in a transaction involving the Plan where its interests were adverse to the interests of the Plan and its participants in violation of ERISA § 406(b)(1).

119.    By purchasing shares of NEB stock from the Plan to fund the liquidation of the NEB stock of Plaintiff and the Class, NEB dealt with assets of the Plan for its own interest and account in violation of ERISA § 406(b)(1).

120.    ERISA § 408(e), 29 U.S.C. § 1108(e) provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a plan if a sale is made for

adequate consideration. The burden is on the fiduciary to prove that conditions for the exemption are met.

121.    ERISA § 3(18)(B) defines adequate consideration as "the fair market of the asset as determined in good faith by the trustee or named fiduciary." ERISA § 3(18)(B) requires that the price paid must reflect the fair market value of the asset, and the fiduciary must conduct a prudent investigation to determine the fair market value of the asset.

122.    For the reasons described above, no such prudent investigation was conducted, and the price paid for the Class's NEB stock did not reflect the fair market value of the asset.

123.    As a result, the Trustees caused the Plan to engage in a prohibited transaction in violation of ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D).

124.    NEB had knowledge of the facts and circumstances giving rise to this prohibited transaction, including because the Trustees who caused it were also directors of NEB and thus their knowledge is imputed to NEB as a matter of law. NEB thus knowingly participated in a prohibited transaction and is subject to appropriate equitable relief for these violations under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT III
### Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) & (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) & (D) Against the Trustee Defendants and Committee Defendants on Behalf of the Class

125.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

126.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

127.    In the context of transactions involving the assets of the Plan, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the plan and its participants receives adequate consideration for the plan's assets and the participants' account in the plan.

128.    Under ERISA § 3(18), adequate consideration means (A) in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange which is registered under section 78f of title 15, or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

129.    To fulfill those fiduciary duties, the Trustees were required to undertake an appropriate and independent investigation of the fair market value of the assets of the Plan to fulfill their fiduciary duties. Among other things, the Trustees were required to conduct a thorough and independent review of any "independent appraisal," to make certain that reliance on any valuation experts' advice was reasonably justified under the circumstances of the purchase, to make an honest, objective effort to read and understand the valuation reports and opinions and question the methods and assumptions that did not make sense.

130.    For the reasons described above, no such independent review ever happened: the Trustees misunderstood their obligations, never undertook meaningful independent review of the appraisals prepared by BRG, made no effort to read and understand those appraisals or to question their methods and assumptions and never so much as met either with BRG or with one another to discuss them.

131.    Had the Trustees conducted an appropriately prudent and loyal investigation, that investigation would have revealed that the valuations used for, and the price paid for the NEB stock in the Plan did not reflect the fair market value of the stock and the purchases of the stock at those prices were not in the best interests of the Plan participants.

132.    This included because, for the reasons described above, the appraisals prepared by BRG of NEB stock held by the Plan failed to mitigate, if not eliminate any marketability discount that would otherwise apply to NEB stock held by the Plan.  Had the BRG eliminated or reduced the marketability discount, the price at which the NEB stock in Plan was sold would have been higher value and the former employee participants would have received a higher price for their NEB shares.

133.    Additionally, Section 8.3(a)(i) of the 2013 Plan Document provided that the amount of the participant's Employer Stock Account "will be based upon the valuation as of the last day of the Plan Year preceding the date of the" participant's termination. Pursuant to the Second Amendment effective as of September 30, 2016, Section 8.3(a)(i) provided that the amount of the participant's Employer Stock Account "will be based upon the valuation as of the last day of the Plan Year preceding or coinciding with the date of the" participant's termination of employment.

134.     Assuming that the terms of Plan Document commands that the amount paid for the assets in the Employer Stock Account did not have to be fair market value as of the date of the transaction, but must be valued preceding or coinciding with the participant's termination, the Supreme Court had expressly held in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) that ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) "makes clear that the duty of prudence trumps the instructions of a plan document."  The Supreme Court re-affirmed that if other fiduciary duties under ERISA § 404(a)(1), such as "the duty of prudence" conflict with the terms of the Plan Document, a fiduciary nonetheless has an obligation to act in accordance with their duties under ERISA § 404(a)(1). Even when the Plan Document "command[s] the ESOP fiduciary" to act in a particular way, the Plan Document "cannot excuse trustees from their duties under ERISA" including the duty to act prudently.

135.     If the Trustees concluded that any provision of the Plan required them to value the assets of the Plan at a specific date, in order to comply with ERISA § 404(a)(1)(D), the Trustees had an obligation to determine whether other duties under ERISA required them to disregard the language of the Plan Document and value the assets in the Plan accounts of the Participants at another date.  The Trustees failed to consider or make any such determination.

136.     Section 6.4 of the 2013 Plan Document expressly provides that along with the applicable Valuation Date "at any other time the Committee may direct, the Trustees will determine the fair market value of Employer Stock and their fair market value of all assets of the Trust Fund" (other than shares in the Suspense Account) "and in Participants Employer Stock Accounts."  If the Trustees concluded that they had to use the Valuation Date defined in the Plan unless they received direction from the Committee, the Committee Defendants had an obligation to determine whether other duties under ERISA required them to direct the Trustees to disregard

the language of the Plan Document and value the assets in the Plan accounts of the Participants at another date. The Committee failed to consider or make any such determination.

137.    Given the substantial lapse of time between the valuation of NEB as of September 30, 2018, and Plaintiff's liquidation on September 29, 2019, and the substantial change in the value of the assets of the Plan during that period, a fiduciary acting consistent with the duties of loyalty and prudence under ERISA would have concluded that using another date for valuation was appropriate such that she would receive fair market value for her assets.

138.    Section 2.15 of the Plan Document provides that "in the case of a transaction between the Plan and a disqualified person (as defined in Code Section 4975(e)(2)), Valuation Date means the date of the transaction."  As the Internal Revenue Code defines a disqualified person as (A) a fiduciary and (C) and employer any of whose employees are covered by the plan, NEB is a disqualified person. As a result, for any transaction between the Plan and NEB, the Valuation Date must be the date of the transaction.

139.    Based on the total amount distributed to Plaintiff on or after September 2019, the value of her Side Fund also was paid at the September 30, 2018, values. The Trustees thus valued the Dollar Account of Plaintiff's account and of other former employees whose Dollar Accounts were liquidated and distributed at a valuation inconsistent with Section 8.3(a)(ii) of the 2013 Plan Document.

140.    Section 6.6 of the 2013 Plan Document provided that the Valuation Date for investments in mutual funds was the last business day of the Plan Year. Using a stale (i.e. year old) price for the mutual funds was not required under Section 8.3(a)(ii) of the Plan Document for any participant who did not elect immediate payment of his or her Dollar Account after termination and was inconsistent with Section 6.6 of the Plan. Accordingly, liquidating assets in

the Plan based on values for assets (i.e. mutual funds) that were publicly traded or for which there was a ready market was not fair market value and was inconsistent with Defendants' ERISA's fiduciary duties.

141.    These failures were not only imprudent but disloyal, for at least three reasons. First, upon information and belief, some Trustees had significant shares of NEB stock held both inside and outside the Plan and it was in their interest for several reasons, including tax purposes, to keep the reported value of NEB stock artificially low. Second, the involuntary repurchases of former employee stock essentially constituted a stock buyback which had the effect of increasing the real value and voting power of other holders of NEB stock. Third, it was also in the interests of the Trustees, who had significant shares of NEB stock (whether in the Plan or outside the Plan) to keep the reported price of NEB stock artificially low because the put option on NEB stock for former employees created a liability and if exercised an expense for NEB that could result in a significant liability or cash expense for NEB and would have the effect of lowering the value of NEB to the Trustees.

142.    The Trustees were required to remedy any underpayment based on undervaluation of the accounts liquidated and distributed to Plaintiff and the Class including as necessary correcting the prohibited transaction by seeking an additional payment from NEB or requiring the breaching fiduciaries (the Trustees) to make up for the underpayment.

143.    By causing the Plan to purchase assets in the Stock Account and the Dollar Account for less than fair market value and failing to correct the underpayments by the Plan or NEB and failing to remedy that underpayment, the Trustees breached their fiduciary duties under ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D) and caused losses to the Plan and the accounts of the Class members.

144.    By failing to direct the Trustees to disregard the language of the Plan Document and value the assets in the Plan accounts of the Participants at another date, the Committee Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D) and caused losses to the Plan and the accounts of the Class members.

## COUNT IV
### Invalidation of the 2019 Amendment, Enforcement of the Terms of the Plan, and Other Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), against NEB on behalf of the Subclass

145.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

146.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

147.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is inadequate because the terms of the Plan, as reflected in the 2013 Plan Document, now include the terms of the August 2019 Amendment. Therefore, a claim challenging the validity of the amendment is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

148.    As a matter of federal common law, which applies to ERISA plans, the terms of the Plan are fixed at the time of acceptance by the employee participant.

149.    The terms of a pension plan at the time that an employee completes substantial performance are the terms that govern the benefits owed to and to be paid to the participant.

36

150.    As a matter of federal common law, the 2019 Amendment is invalid to the extent it applies to participants of the ESOP who completed substantial performance before its effective date.

151.    Plaintiff's more than twenty-five years of service to NEB before August 1, 2019, constituted substantial performance by Plaintiff. Additionally, Plaintiff provided notice of her intent to retire before the adoption of the 2019 Amendment.

152.    Effective August 1, 2019, NEB adopted the Third Amendment to the Plan which changed the Plan for former employees who remained as participants in the Plan (the 2019 Amendment).  The 2019 Amendment added a new Section 6.9, amended Section 8.1, 8.2, 8.3, 8.4, 9.1 and 13.4.

153.    The 2019 Amendment eliminated the ability of former employees to remain invested in employer stock through the Plan.

154.    Based on notes from the Department of Labor of a conversation with Tinger on August 30, 2019, and the Notes to the 2018 Form 5500 (through the year ended September 30, 2019), NEB and the ESOP fiduciaries applied the 2019 Amendment to former employee participants.

155.    Because Plaintiff terminated her employment with NEB on September 27, 2019, less than two months after the adoption of the 2019 Amendment, the terms of the 2019 Amendment were applied to her and her Plan account (including her NEB stock) was involuntarily liquidated on September 29, 2019.

156.    The 2019 Amendment is invalid as to participants of the ESOP who completed substantial performance before the effective date of the amendment and their beneficiaries, including all members of the Subclass.

157.    As a result, Plaintiff and the Subclass have a right to have the 2019 Amendment declared invalid as to them, to a declaration that their rights and benefits are and will be determined under the Plan in effect when they completed substantial performance and are entitled to have the Plan reformed accordingly and to an injunction requiring administration of the Plan in a manner consistent with the terms of the Plan before the 2019 Amendment.

**COUNT V**
**Violation of the Anti-Cutback Provision of ERISA § 204(g), 29 U.S.C. § 1054(g) against Defendant NEB on behalf of the Subclass**

158.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

159.    ERISA § 204(g), 29 U.S.C. § 1054(g) provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." This section also provides that "a plan amendment which has the effect of… eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits."

160.    An accrued benefit includes not only the "net effect" of the dollars earned or paid under the plan, but also the features and elements of the benefit formula itself. As a result, the accrued benefits protected from elimination by amendment under ERISA § 204(g) include the conditions on which the benefits are to be paid under the plan.

161.    Accrued benefits are considered decreased for purposes of ERISA § 204(g) not only when they are reduced in size or eliminated, but also when the plan imposes new conditions or materially greater restrictions on their receipt.

162.    Under the Plan Document before the 2019 Amendment, a Subclass participant who terminated was entitled to remain a participant in the Plan and continue to hold NEB stock in her Plan account until age 65. Before the 2019 Amendment, such former employee

participants were entitled to the same benefit distribution options under the Plan as any other participant. These benefit rights were and are accrued benefits.

163.    By divesting and thereby eliminating the rights of Plaintiff and the Subclass to continue holding NEB stock in their individual Plan accounts, and by the forced liquidation of these participants' NEB stock, the 2019 Amendment decreased accrued benefits of Plaintiff and the Subclass.

164.    IRS regulations explain that "optional forms of benefit" include "terms relating to the payment schedule, timing, commencement, medium of distribution (e.g., in cash or in kind), election rights, differences in eligibility requirements, or the portion of the benefit to which the distribution alternative applies." 26 C.F.R § 1.411(d).

165.    As a result of using a valuation that failed to appropriately value NEB stock, the account balances of Plaintiff and the Subclass were reduced upon the involuntary liquidation of their NEB stock.

166.    As a result, the 2019 Transaction and the involuntary liquidations of the NEB stock held by Plaintiff and members of the Subclass constituted a prohibited cut-back of benefits in violation of ERISA § 204(g).

## COUNT VI
### Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) & (D),
### 29 U.S.C. §§ 1104(a)(1)(A), (B) & (D) Against NEB on Behalf of the Class for Failure to
### Monitor the Trustees & the Committee Defendants

167.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

168.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the

39

circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

169.    Under ERISA § 404(a)(1)(A) and (B), a fiduciary with the authority to appoint or remove other fiduciaries has an obligation to undertake an appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the appointed fiduciary remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

170.    According to Sections 11.4, 12.1 and 13.10 of the 2013 of the Plan Document, NEB has the responsibility to appoint, remove and replace the Trustees and the Committee members and monitor their performances.

171.    As the actions of its officers and directors are imputed to NEB and each of members of the Committee and the Trustees are or were at the relevant times, officers or directors of NEB, NEB knew or in the exercise of reasonable diligence, should have known about all the above breaches and violations by the Committee and the Trustees but took no appropriate corrective action. Additionally, Section 13.11 required the Trustees to render written accounts of their transactions under the Plan and their administration of the Trust Fund.

172.    Had NEB properly monitored the Trustee, NEB should have done one or more of the following: (a) promptly removed and replaced the Trustees and the Committee as fiduciaries; (b) appointed an independent fiduciary; or (c) taken actions necessary to remedy any fiduciary breaches including as necessary, remedy the underpayment for NEB stock; or (d) a combination of the foregoing.

173.    By failing to properly monitor the Trustees and the Committee or failing to take appropriate action upon learning of information that the Trustees and the Committee had breached its duties, NEB breached its fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D).

**COUNT VII**
**Co-Fiduciary Liability Pursuant to ERISA § 405, 29 U.S.C. § 1105**
**Against Ellard, Ireland, Comb, and NEB on behalf of the Class and the Subclass**

174.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

175.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

176.    Comb, Ireland, and Ellard each violated ERISA § 405(a)(1) and (3) by acting together as Trustees to cause the prohibited transactions described in Count I and committing the fiduciary breaches described in Count III because they each knew that the process they individually and collectively undertook to value NEB stock was deficient and knew or in the reasonable exercise of diligence should have known that the price paid for NEB was below fair market value. Despite having knowledge of these breaches they made no efforts to remedy the breach. As such, each of Ellard, Ireland, and Comb is liable to the Class for the breaches of the other Trustees pursuant to ERISA § 405(a)(1) and (3).

177.    Comb, Ireland, and Ellard each violated ERISA § 405(a)(1) and (3) by acting together as members of the Committee to commit the fiduciary breaches described in Count III because they each knew or in the reasonable exercise of diligence should have known that it was imprudent to use a year-old valuation report for purposes of liquidating the NEB stock held by Plaintiff and members of the Class through the Plan. Despite having knowledge of these breaches they made no efforts to remedy the breach. As such, each of Ellard, Ireland, Comb is liable to the Class for the breaches of the Committee and the other members of the Committee pursuant to ERISA § 405(a)(1), (3).

178.    NEB violated ERISA § 405(a)(1) and (3) by knowingly participating in the prohibited transactions described in Count I and the fiduciary breaches described in Count III, including because the knowledge of each of Comb, Ireland, and Ellard was imputed to NEB as a matter of law and because NEB was a party to the purchase of the liquidated stock of members of the Class. Despite having knowledge of these breaches NEB made no effort to remedy the breach, including by as necessary replacing the Trustees. NEB is thus liable for the breaches of each of Ellard, Ireland, and Comb under Count I and Count III under ERISA § 405(a)(1) and (3).

179.    NEB violated ERISA § 405(a)(2) by failure to comply with section 404(a)(1) in the administration of its specific responsibilities which give rise to his status as a fiduciary, specifically by applying the terms of the 2019 Amendment to members of the Subclass as described in Count IV. Because the NEB stock of members of the Subclass would not have been involuntarily liquidated absent that fiduciary breach, NEB enabled the Trustees and the Committee to engage in prohibited transactions and breach their fiduciary duties as described in Count I and Count III as to members of the Subclass. NEB is thus liable for the breaches of

Ellard, Ireland, Comb, and the Committee as set forth in Count I and Count III as to members of the Subclass pursuant to ERISA § 405(a)(2).

## ENTITLEMENT TO RELIEF

180.    Because of the violations set forth in the above paragraphs, Plaintiff and the Class have a right to sue each of the Defendants (each of whom is fiduciaries) under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

181.    Because of the violations set forth in the above paragraphs, Plaintiff and the Class are entitled under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue the Defendants for appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays on behalf of herself, the Class, and the Subclass for judgment against the Defendants, jointly and severally, on each claim, and to be awarded the following relief:

A.    Declare that each of the Defendants have breached their fiduciary duties to the Plan and the Class, are liable under ERISA § 405, or knowingly participated in other fiduciaries' breaches of fiduciary duty;

B.    Enjoin the Defendants and each of them from further violations of their fiduciary responsibilities, obligations and duties;

C.    Order that the Defendants found to have breached their fiduciary duties to the Plan to jointly and severally make good to the Plan or to any successor trust(s) the losses

resulting from their breaches and restore any profits they have made through use of assets of the Plan;

D.      Order that the Defendants provide other appropriate equitable relief to the Plan, Plaintiff, the Class, and the Subclass including, but not limited to, surcharge, an accounting for profits, imposing a constructive trust or equitable lien on any funds wrongfully held by any of Defendants or other traditional equitable remedies that will make the Plaintiff, the Class and Subclass whole;

E.      Declare any transaction that constitutes a prohibited transaction void and (1) requiring any fiduciary or party in interest to disgorge any profits made, (2) declaring a constructive trust over the proceeds of any such transaction or (3) any other appropriate equitable relief, whichever is in the best interest of the Plan;

F.      Order that Plaintiff and the members of the Subclass be reinstated in the Plan as of September 2019 and that the terms of the written instrument of the Plan be reformed to eliminate the applicability of the 2019 Amendment as to Plaintiff and members of the Subclass;

G.      Order the proceeds of any recovery for the Plan to be allocated to the accounts of the Class to make them whole for any injury that they suffered because of the breaches of fiduciary duty in accordance with the Court's declaration with respect to the terms of the Plan;

H.      Order pursuant to ERISA § 206(d)(4) that any amount to be paid to or necessary to restore losses to the account of Plaintiff and the Class can be satisfied by using or transferring any breaching fiduciary's account in the Plan to the extent of his liability;

I.      Declare that any indemnification agreement between any of the Defendants and the Plan violates ERISA § 410, 29 U.S.C. § 1110, and is therefore null and void;

J.      Require Defendants to pay attorney's fees and the costs of this action pursuant to

ERISA §502(g)(1), 29 U.S.C. § 1132(g)(1) or ordering the payment of reasonable fees and expenses of this action to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class or Subclass here;

      K.      Order Defendants to pay prejudgment interest and post-judgment interest; and

      L.      Award any such other relief that the Court determines that Plaintiff, the Class and the Subclass are entitled pursuant to ERISA §502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or that is otherwise just and proper

Dated: September 26, 2023

Respectfully submitted,

*/s/ Jonathan M. Feigenbaum*
_____
Jonathan M. Feigenbaum, Esq.
BBO# 546686
184 High Street
Suite 503
Boston, MA 02110
Tel. No.: (617) 357-9700
Fax No.: (617) 227-2843
Email: jonathan@erisaattorneys.com

R. Joseph Barton (application for admission *pro hac vice* to be filed)
Colin M. Downes (application for admission *pro hac vice* to be filed)
BARTON & DOWNES LLP
1633 Connecticut Ave. NW Ste. 200
Washington, DC 20009
Tel: (202) 734-7046
Email: jbarton@bartondownes.com
Email: colin@bartondownes.com

*Counsel for Plaintiff*

45